## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

Fredrick Devon Thomas, (R40739),    )
    )
    Plaintiff,    )
    )    Case No. 21 C 50200
    v.    )
    )    Hon. Iain D. Johnston
    )
Scott Booth, Shirmekas Doss, and,    )
Valerie Kidd,    )
    )
    Defendants,    )

## MEMORANDUM OPINION AND ORDER

Plaintiff Frederick Devon Thomas brings this *pro se* 42 U.S.C. § 1983 action challenging the treatment of his diabetes while a pretrial detainee at the Winnebago County Jail. He focuses on two alleged deficiencies: (1) the quality of his diet; and (2) the sufficiency of his exercise opportunities. Pending before the Court are the parties' cross motions for summary judgment (Dkt. 101, 105, 108, 118), and Plaintiff's motions to dismiss Defendants' motion for summary judgment. (Dkt. 141.) For the reasons set forth below, Defendants' motions for summary judgment are granted, and Plaintiff's motions for summary judgment and to dismiss Defendants' summary judgment motion are denied.

## I.      Background

As the parties have brought cross motions for summary judgment, the Court reviews the facts set forth in the record and makes all reasonable inferences in the light most favorable to the nonmoving party on each motion. *Birch|Rea Partners, Inc. v. Regent Bank*, 27 F.4th 1245, 1249 (7th Cir. 2022). Plaintiff is a Type 2 diabetic. (Dkt. 110-2, pg. 7; Dkt. 112-9, pg. 3.) Type 2 diabetics tend to be adults who are overweight and/or have a family history of diabetes. (Dkt.

102-3, pg. 27.)   The disease is treated via dietary and lifestyle changes along with medication. *Id*. at 28.

Plaintiff was 30 years old when he was first diagnosed with diabetes in late 2015.   (Dkt. 110-2, pgs. 6, 12.)   He claims he was not experiencing any symptoms at the time of his initial diagnosis, but decided to be tested because both his mother and uncle are diabetic.   *Id*. at 12.

Plaintiff's mother was the primary source of his education regarding managing his diabetes. (Dkt. 102-1, pg. 77.)   The hospital where he was diagnosed allegedly provided Plaintiff only a short video to watch on what to eat.   *Id*. at 76-77.   Plaintiff took his dietary and exercise plan from his mother's example as she had managed her diabetes for many years.   *Id*. at 77.   This plan consisted of a "lot of salad, lot of meat," and avoiding food high in carbohydrates.   *Id*. Additionally, Plaintiff strived to stay away from breads, pasta, potatoes, "pops, juices, a lot of sweets basically," and to eat every four hours.   *Id*.   Plaintiff stated that prior to his detention, he primarily ate eggs and sausage for breakfast, and salads and meats for dinners.   *Id*. at 79.   He would sometimes skip lunch.   *Id*.

Plaintiff further explained that he exercised regularly as an additional way to manage his diabetes.   He would run on a treadmill for an hour and half per day.   *Id*. at 44.   He would also do an extended number of burpees[1] over a two-hour period.   *Id*.

In addition to diet modification and exercise, Plaintiff was prescribed prescription medication to treat his diabetes.   *Id*. at 11.   His doctor initially prescribed him Glipizide,[2] and

---

[1] Plaintiff explained he would start in a standing position, drop to the ground, do a push up, move to a squatting position, and stand back up.   *Id*.   He would repeat this action repeatedly for exercise.   *Id*.

[2] Glipizide is used to treat Type 2 diabetes.   *Waldrop v. Wexford Health Sources, Inc.*, 646 F. App'x 486, 491 n.2 (7th Cir. 2016) (providing discussion of Glipizide drawn from the Physicians' Desk Reference and National Library of Medicine).   Glipizide helps to lower a person's blood sugar by causing the pancreas to produce insulin and help the body use insulin efficiently.   *Id*.

2

then later switched him to Metformin.[3]  *Id*.  Plaintiff states that he was not initially taking insulin when diagnosed with diabetes.  *Id*. at 9.

Plaintiff entered the Winnebago County Jail on February 2, 2018, following an arrest for aggravated domestic battery.  (Dkt. 102-1, pg. 19; Dkt. 112-1, pg. 8.)  Winnebago County outsources medical care for Jail detainees to the University of Illinois College of Medicine at Rockford.  (Dkt. 102-4, pg. 10-11.)  When a detainee first enters the Jail, a College of Medicine nurse conducts an initial examination of the detainee.  *Id*. at 11-12.  Plaintiff reported that he was diabetic during his intake.  (Dkt. 102-1, pg. 19.)

Food service at the Jail is contracted out to Aramark Food Services.  (Dkt. 102-4, pg. 5.) The inmates' food menu is set by contract between Winnebago County and Aramark.  (Dkt. 102-6, pg. 14.)  Aramark also provides several special diets for the detainees under the contract.  *Id*. at 16.  A special diet for medical purposes is ordered by the medical staff who faxes an instruction form to the Aramark kitchen staff at the Jail.  *Id*. at 16-17.

Aramark's menus are designed by a registered dietitian who ensures that the meals served at the Jail meet caloric and nutritional requirements.  (Dkt. 110-6, pgs. 2-3.)  The dietitian follows the guidelines set by the American Correctional Association and the Food and Nutrition Board of the Institute of Medicine, National Academy of Sciences.  *Id*. at 3.

Aramark provides a carbohydrate-controlled diet at the Jail under its contract.  *Id*. at 4. The carbohydrate-controlled meal consisted of the regular meal but substitutes fresh fruit or 100%

---

3 Metformin is used to treat Type 2 diabetes.  National Library of Medicine, Metformin, *available at:* https://www.ncbi.nlm.nih.gov/books/NBK518983/ (last visited August 30, 2024).  Metformin helps to lower a person's blood sugar by decreasing glucose production in the liver, diminishing absorption of a glucose in the intestines, and enhancing insulin sensitivity.  *Id.*

fruit juice in place of a dessert. *Id*. Additionally, added sugars used in preparing the food or additions like jelly for bread are removed from the carbohydrate-controlled meal. (Dkt. 102-6, pg. 33.) As a result, the carbohydrate-controlled menu is 2,200 calories per day while the regular menu is 2,800 calories per day. *Id*.

Plaintiff concedes that he was placed on a carbohydrate-controlled meal plan when he entered the Jail but believes the meal was insufficient for diabetics. (Dkt. 102-1, pg. 16.) ("Well, first we were getting meals the same as regular population. The only thing they was changing was a cake to fruit, and that was an apple or orange or banana or something like that."); (Dkt. 102-1, pg. 94.) ("I disagree with the food, period, due to the fact that, you know, they're saving money by buying rice, potatoes, bread, you know, and serving it to diabetic inmates just so it's better for them. So that's what I disagree on."). Plaintiff explained that he tried to reduce his carbohydrates and increase his meats and vegetables through purchasing canned tuna at the Jail commissary and bartering junk food from the commissary (which he alleges he bought only to barter, not to eat) with other inmates in exchange for meats and vegetables from their Jail meals. *Id*. at 56-59, 91.

As mentioned, Plaintiff was in the Jail on an aggravated battery charge beginning in February 2018. (Dkt. 102-1, pg. 19; Dkt. 112-1, pg. 8.) In June 2018, Plaintiff pled guilty to the charge and was released from custody based on time served. (Dkt. 112-1, pg. 7.) Following his release, Plaintiff had his A1C level checked at the Crusader Clinic in Rockford on June 27, 2018. (Dkt. 102-1, pg. 81; 117-4, pg. 3.)

4

An A1C test is a blood test that measures a person's average blood sugar level over the past three months.[4] A normal A1C result is below 5.7%, prediabetes is 5.7% to 6.4%, and diabetes is 6.5% or above. An A1C of 7% translates to an estimated average glucose of 154, A1C of 8% is a glucose of 183, A1C of 9% is a glucose of 212, and A1C of 10% is a glucose of 240. A random blood sugar test with a glucose level over 200, or a fasting blood sugar test over 126, indicates diabetes.[5]

The June 26th A1C level was 9.0% indicating diabetes. (Dkt. 102-1, pg. 81; 117-4, pg. 3.) This high A1C result on June 26th led Plaintiff to conclude that the food served to him at the Jail during his detention caused his uncontrolled diabetes. (Dkt. 102-1, pg. 81.) ("I knew it was the meals that I had gotten, that I was consuming from this county jail because when I got out, I went to Crusader Clinic in Rockford and I had my A1C checked . . . . It was supposed to be at 5 or something, or a 6. So 9.0, that's high. So that's how I know that it was the food that I was eating here."). Plaintiff alleges he suffers from diabetic symptoms when his blood sugar is elevated including numbness in his feet and toes, locking up of his hands, and impact on his vision. *Id* at 36. He attributes these symptoms to the food served to him at the Jail. *Id*. at 36.

Plaintiff's medical records tell a different story. The record contains a blood test from August 22, 2017, five and half months before Plaintiff entered the Jail in February 2018, and

---

4 Center for Disease Control and Prevention, All About Your A1C, *available at*: https://www.cdc.gov/diabetes/managing/managing-blood-sugar/a1c.html#:~:text=The%20A1C%20test%E2%80%94also%20known,care%20team%20manage%20your%20diabetes (last visited August 30, 2024).

5 Centers for Disease Control and Prevention, Diabetes Tests, *available at*: https://www.cdc.gov/diabetes/basics/getting-tested.html#:~:text=Fasting%20Blood%20Sugar%20Test&text=A%20fasting%20blood%20sugar%20level,higher%20indicates%20you%20have%20diabetes (last visited August 30, 2024).

almost a year before the June 2018 Crusader Clinic test.   (Dkt. 112-5, pg. 45.)   Plaintiff's glucose level was 222 and his A1C was 9.0 at the August 2017 test.   *Id*.

Plaintiff's blood sugar was checked at least twice a day, at 5 a.m. and again at 7 p.m. daily, while at the Jail unless he refused the test.   (Dkt. 112-5, pgs. 25-31.)   His blood sugar glucose was 308 when he was booked at the Jail on February 2, 2018, four and half months before the June 2018 Crusader Clinic test.   *Id*. at 31.   Plaintiff's blood sugar results over the next few days in February 2018 were 308, 227, 199, 225, 188, 331, 236, 539, 385, 232, and 302.   *Id*.   His A1C level on March 14, 2018, was 10.1.   (Dkt. 117-4, pg. 1.)   The record shows Plaintiff's A1C and glucose levels were high before, and immediately upon, his initial detention at the Jail in February 2018.

Plaintiff returned to the Jail on September 11, 2018, this time on a murder charge.   (Dkt. 102-1, pg. 13; Dkt. 112-2, pg. 10.)   He was seen by a nurse on September 18, 2018, where he reported his diabetes and informed the nurse to contact the Crusader Clinic for his medical records. (Dkt. 112-4, pg. 1.)    The Crusader Clinic records showed that Plaintiff was previously prescribed Glipizide, Metformin, and Gabapentin.[6]   *Id*.; (Dkt. 102-3, pg. 18.)   He was also again placed on a carbohydrate reduced diet upon his September 2018 readmission to the Jail.   (Dkt. 112-5, pg. 69.)

Plaintiff's blood sugar was again checked twice daily following his detention at the Jail beginning on September 19, 2018.   (Dkt. 112-4, pgs. 2-80.)   The September 19th tests showed glucose levels of 305 and 473.   (Dkt. 112-4, pg. 80.)   His glucose readings over the next few days

---

6 Gabapentin is an anticonvulsive medication, but its off-label use includes addressing pain from diabetic neuropathy. National Library of Medicine, Gabapentin, *available at*:  https://www.ncbi.nlm.nih.gov/books/NBK493228/ (last visited August 30, 2024).

in September 2018 were 217, 303, 325, 319, 305, 148, 205, 231, and 195. *Id*. at 80. Plaintiff remained on Metformin and Glipizide until January 25, 2019, when the Glipizide was discontinued and replaced with insulin. (Dkt. 112-9, pg. 3.)

Plaintiff would refuse his blood sugar checks, insulin and/or Metformin medicine intermittently at times during his detention. (Dkt. 112, pgs. 2-3.) He explained that the insulin and Metformin sometimes made him need to urinate frequently. (Dkt. 102-1, pg. 52-52.) As a result, Plaintiff refused his insulin and Metformin at times due to the discomfort caused by the frequent urination. *Id*.

Plaintiff received regular A1C testing during his detention. As mentioned, Plaintiff reentered the Jail on the murder charge on September 11, 2018. (Dkt. 102-1, pg. 13; Dkt. 112-2, pg. 10.) The A1C results following his second detention were: 10.6% on October 9, 2018, 10.0% on December 7, 2018, 9.8% on March 25, 2019, 8.8% on June 18, 2019, 9.4% on October 10, 2019, 10.0% on January 10, 2020, 8.9% on April 13, 2020, 8.7% on July 13, 2020, 9.4% on October 6, 2020, 8.5% on January 7, 2021, 8.1% on April 12, 2021, 9.3% on July 8, 2021, 8.9% on November 19, 2021, and 8.0% on February 8, 2022. (Dkt. 117-4, pgs. 2, 4-16.)

Plaintiff also challenges the exercise opportunities provided at the Jail. He believes the medical department should have required the Jail guards to allow him more time out of his cell so that he could do his exercises in the dayroom where he could be supervised by the correctional guards. (Dkt. 102-1, pgs. 51-52.)

Plaintiff conceded that there were various exercises he could do in his cell, but his concern was doing the exercises unsupervised. *Id*. at 113 ("You could do that in every cell, push-ups. I'm not disputing about the fact that you --- you can do exercises in the cell. What I was saying

earlier is that, you know, when you're in the cell, you taking a risk of doing these exercises when you're taking insulin and metformin and your sugar dropping. You can end up falling out and hurting yourself."). He wanted to have more time in the dayroom because the guards and fellow detainees would be watching him perform his exercises. *Id*. at 48 ("I was scared." [] I felt comfortable more doing those types of exercises in the rec room or when we in the dayroom, because, first of all, they have camera in the dayroom where they were watching over the cells, and then the officer is sitting on the pod. If I fall out or anything, they hurry up and get the officer 'Hey, this guy, he fell out.' If I'm in a cell, you know, I have a cellie; but like I said, the intercom in the cell, if you work out, you call out, you hit the intercom, they don't answer the intercom right then and there. It takes 15 minutes for them to come. So anything that happened to me, if it was 15 minutes, I could end up dying or something.").

Plaintiff's deposition testimony established that he had potentially between seven to ten hours a day out of his cell. He explained that he was allowed out of his cell at 7 a.m. and then returned to his cell at 9:30 a.m. (Dkt. 102-1, pg. 104.) He was allowed back out of his cell from 10:00 a.m. to 11:00 a.m. *Id*. He was then again returned to his cell between 11:00 a.m. to 12:30 p.m., then allowed to be out of the cell from 12:30 p.m. to 4:00 p.m. *Id*. at 104-05. Additionally, two evenings a week, inmates were allowed out of their cells from 7:30 or 8 p.m. until 10:30 p.m. *Id*. at 105.

Detainees were served meals in their cells. *Id*. at 104. During the time out of their cells, they had an opportunity to use the shower, law library, make personal calls, and the dayroom for exercise, socializing with other inmates, or watching TV. *Id*. at 112.

8

Plaintiff explained that at times he only had one hour out of his cell due to lockdowns because of staffing shortages, the Covid-19 pandemic, or his placement in segregation. *Id*. He explained that this one hour of time out of the cell was insufficient to both exercise and take care of other responsibilities such as working on legal matters at the law library or taking a shower. *Id*.

Plaintiff names Scott Booth, Shirmekas Doss, and Valerie Kidd as Defendants. Scott Booth is a correctional officer who has been responsible for managing the Jail kitchen since October 2021. (Dkt. 102-2, pg. 1.) His declaration explains that he oversees the detainees and civilian food service staff who prepare meals. *Id*. He has no authority to decide what food is served to the detainees. *Id*. at 2. A dietician from Aramark creates the menus that he follows including the menu for detainees on special menus such as the carbohydrate-controlled diet. *Id*. It is up to the medical staff from the University of Illinois College of Medicine Rockford to assign a detainee to a special diet and he follows the instructions from the medical staff. *Id*. In short, Booth oversaw the preparation and delivery of Plaintiff's meals, but he did not plan, nor have authority to alter, what was in the meals.

Shirmekas Doss is the Food Service Director for Aramark. (Dkt. 110-7, pg. 1.) She was responsible for overseeing Aramark's food service program at the Jail. *Id*. at. 3. She did not develop the menu of the meals served to the jail detainees. *Id*. Instead, she was responsible for overseeing the ordering of the food, managing inventory, kitchen cleanliness, and the workers' preparation and delivery of meals off the preset menus. *Id*. at 2-4. The menus served at the Jail are created by a dietician employed by Aramark. (Dkt. 102-6, pg. 13.)

Valerie Kidd is a registered nurse at the University of Illinois College of Medicine Rockford. (Dkt. 112-9, pg. 1.) She provided him medication and responded to a medical grievance while he was that the Jail. *Id*. at 3. She had no authority over his medical treatment plan or his meals. *Id*. at 2, 6. Plaintiff explains that he sued Kidd because she "is the head boss over the Winnebago County Jail medical department, so she is responsible for everyone's actions in the medical department." (Dkt. 102-1, pg. 28-29.) Additionally, Plaintiff claims Kidd responded improperly to one of his grievances. *Id*. at 29.

Plaintiff was convicted of first degree murder in April 2021, and has been transferred from the Jail to the Illinois Department of Corrections. (Dkt. 102, pg. 1.) He is now incarcerated at the Menard Correctional Center. His instant lawsuit seeks both improved diabetic meals at the Jail, and monetary damages. (Dkt. 41, pg. 10.)

## II. Analysis

Before turning to the parties' cross summary judgment motions, the Court notes that Plaintiff's relocation to the Illinois Department of Corrections moots his request for improved diabetic meals at the Jail. *Hildreth v. Butler*, 960 F.3d 420, 431 (7th Cir. 2020). His request for monetary relief, however, remains in the case. *Id*.

On summary judgment, the Court must view the record in the light most favorable to the non-moving party and grant the motion if the movant "show[s] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Gupta v. Melloh*, 19 F.4th 990, 997 (7th Cir. 2021); Fed. R. Civ. P. 56(a). Summary judgment is warranted "against a party who fails to make a showing sufficient to establish the existence of an element that is

essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The parties seeking summary judgment bear the initial burden of showing the grounds for their motion. *Id.* at 323. Once they have done so, "the burden shifts to the non-moving party to provide evidence of specific facts creating a genuine dispute." *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). A factual dispute is genuine when a reasonable jury could return a verdict in favor of the non-moving party. *Id.* While courts must draw all inferences in favor of the non-moving party, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, "the nonmoving party must set forth specific facts showing a genuine issue for trial." *Abrego v. Wilkie*, 907 F.3d 1004, 1011–12 (7th Cir. 2018) (citing *Matsushita*, 475 U.S. at 587).

As a pretrial detainee at the time of the alleged events, Plaintiff's claims arise under the Fourteenth Amendment and are governed by the objective reasonableness standard set forth in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015). *See Kemp v. Fulton Cnty.*, 27 F.4th 491, 495 (7th Cir. 2022); *Hardeman v. Curran*, 933 F.3d 816, 823 (7th Cir. 2019). To succeed on his claims, Plaintiff must show that the defendants: (1) intended to carry out a certain course of actions; and (2) the course of actions were not objectively reasonable. *Pittman by and through Hamilton v. Madison County, Illinois*, 108 F.4th 561, 568 (7th Cir. 2024). The first element, the intent to carry out a certain course of actions, "asks strictly whether the defendant intended to commit the physical act that caused the alleged injury." *Id*. at 570. The second element, evaluating the reasonableness of the action, applies an objective reasonableness standard from the position of a

reasonable official in the defendant's position. *Id.* at 570. Plaintiff's claims fail under these standards.

Turning to Plaintiff's first claim regarding his meals, he cannot demonstrate the defendants' committed any actions that resulted in the alleged constitutional violation. *Pittman by and through Hamilton*, 108 F.4th at 568. Plaintiff disputes the quality of the meals he received at the Jail as it relates to the management of his diabetes but none of the Defendants named in this case had any personal involvement in designing the menu. *See Whitfield v. Spiller*, 76 F.4th 698, 706 (7th Cir. 2023) (to recover damages under § 1983, a plaintiff must establish that a defendant was personally responsible for the deprivation of a constitutional right). It appears Plaintiff improperly names these Defendants merely because of their status as supervisory officials.

The undisputed evidence in the record is that Plaintiff was dissatisfied with the meal menu, but the menu was created by a Aramark dietitian who is not a party to this case. (Dkt. 102-6, pg. 13.) In turn, Plaintiff claims that Aramark created at poor menu to save money. (Dkt. 102-1, pg. 94.) Plaintiff's complaint is with Aramark and its dietitian, not these defendants.

Second, Plaintiff cannot demonstrate that any of the defendants (or even Aramark and the dietitian) engaged in objectively unreasonable actions regarding his meals. *Pittman by and through Hamilton*, 108 F.4th at 568. As mentioned, Plaintiff's complaint is with the menu constructed by the Aramark dietitian. But, the evidence in the record shows that she followed the guidelines set by the American Correctional Association and the Food and Nutrition Board of the Institute of Medicine, National Academy of Sciences when constructing the menu at issue. (Dkt. 110-6, pgs. 2-3.)

12

Plaintiff's case at its core is predicated upon a belief that he should be able to manage his diabetes using the methods he learned from his mother and utilized before his detention at the Jail. It is commendable that Plaintiff recognizes the risks presented by his diabetes and wants to manage it through a quality diet and exercise. In turn, Plaintiff wishes to reduce the roll of medication in his disease management. (Dkt. 102-1, pg. 52-52.) This disagreement over his course of treatment, be it more food and exercise focused, or more medication focus, does not demonstrate a constitutional violation. *Williams v. Ortiz*, 937 F.3d 936, 944 (7th Cir. 2019) (recognizing that a disagreement with the provided course of care does not demonstrate the care is unreasonable).

Regarding Plaintiff's second claim about the ability to exercise out of his cell, like the first claim, there is no evidence of involvement by these Defendants. Moreover, there is no right to exercise out of a cell as Plaintiff desires. A lack of exercise may violate the Constitution "where movement is denied and muscles are allowed to atrophy and the health of the individual is threatened." *See Smith v. Dart*, 803 F.3d 304, 313 (7th Cir. 2015) (cleaned up); *see, e.g., Thomas v. Ramos*, 130 F.3d 754, 764 (7th Cir. 1997) (plaintiff able to exercise in his cell did not suffer constitutional deprivation even though the conditions were "less than ideal"); *Ellis v. Santerelli*, No. 20 C 5959, 2023 WL 4976180, at *9 (N.D. Ill. Aug. 3, 2023) (plaintiff's dissatisfaction with inability to exercise "in accordance with his personal preferences" did not rise to the level of a constitutional deprivation); *Robeson v. Squadrito*, 57 F. Supp. 2d 642, 647 (N.D. Ind. 1999) (granting summary judgment where inmate was not taken to gymnasium, but acknowledged he could exercise in his cell).

As a final point, the Court also notes that Plaintiff fails as to causation. General principles of causation from tort law are considered in a § 1983 case. *Hunter v. Mueske*, 73 F.4th 561, 567-

13

68 (7th Cir. 2023). It is true that summary judgment on causation is rare as the matter is traditionally one for the jury, but it is proper when there is no evidence in the record to support causation. *Stockton v. Milwaukee County*, 44 F.4th 605, 615 (7th Cir. 2022).

Plaintiff alleges that he knows the food at the Jail caused his elevated blood sugar as shown by the fact that his A1C was 9.0% when he had it checked at the Crusader Clinic in June 2018 after his first stint at the Jail. (Dkt. 102-1, pg. 81; 117-4, pg. 3.); (Dkt. 102-1, pg. 81.) ("I knew it was the meals that I had gotten, that I was consuming from this county jail because when I got out, I went to Crusader Clinic in Rockford and I had my A1C checked . . . . It was supposed to be at 5 or something, or a 6. So 9.0, that's high. So that's how I know that it was the food that I was eating here.").

Plaintiff's assertion is refuted by the blood test in the record from August 22, 2017, five and half months before Plaintiff entered the Jail in February 2018, and almost a year before the June 2018 Crusader Clinic test. (Dkt. 112-5, pg. 45.) Plaintiff's glucose level was 222 and his A1C was 9.0 at the August 2017 test. *Id*.

Additionally, his blood sugar glucose was 308 when he was booked at the Jail on February 2, 2018, four and half months before the June 2018 Crusader Clinic test. (Dkt. 112-5, pg. 31.) Plaintiff's blood sugar results over the next few days in February 2018 were 308, 227, 199, 225, 188, 331, 236, 539, 385, 232, and 302. *Id*. His A1C level on March 14, 2018, was 10.1. (Dkt. 117-4, pg. 1.) The record shows Plaintiff's A1C and glucose levels were high before, and immediately upon, his initial detention at the Jail in February 2018. Plaintiff also cannot

demonstrate causation in light of this unrebutted medical evidence. Defendants are entitled to summary judgment.[7]

Plaintiff is advised that this is a final decision ending his case in this Court. If Plaintiff wishes to appeal, he must file a notice of appeal with this Court within thirty days of the entry of judgment. *See* Fed. R. App. P. 4(a)(1). Plaintiff need not bring a motion to reconsider this Court's ruling to preserve his appellate rights. However, if Plaintiff wishes the Court to reconsider its judgment, he may file a motion under Federal Rule of Civil Procedure 59(e) or 60(b). Any Rule 59(e) motion must be filed within 28 days of the entry of this judgment. *See* Fed. R. Civ. P. 59(e). The time to file a motion pursuant to Rule 59(e) cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A timely Rule 59(e) motion suspends the deadline for filing an appeal until the Rule 59(e) motion is ruled upon. *See* Fed. R. App. P. 4(a)(4)(A)(iv). Any Rule 60(b) motion must be filed within a reasonable time and, if seeking relief under Rule 60(b)(1), (2), or (3), must be filed no more than one year after entry of the judgment or order. *See* Fed. R. Civ. P. 60(c)(1). The time to file a Rule 60(b) motion cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A Rule 60(b) motion suspends the deadline for filing an appeal until the Rule 60(b) motion is ruled upon only if the motion is filed within 28 days of the entry of judgment. *See* Fed. R. App. P. 4(a)(4)(A)(vi).

---

7 The Court also denies Plaintiff's motion to dismiss Defendants' summary judgment motions. [141] The motion argues that Plaintiff did not receive a copy of Defendants' reply by the set reply date. Plaintiff does not explain whether he never received the replies or if they were just after the deadline. Regardless, there is no prejudice to Plaintiff by this alleged defect as the Court is granting summary judgment predicated upon Defendants' motions and Rule 56.1 materials to which Plaintiff filed a response.

15

### III.  Conclusion

Defendants' motions for summary judgment [101, 105, 108] are granted.  Plaintiff's motions for summary judgment [118] and to dismiss Defendants' summary judgment motions [141] are denied.  Any pending motions are stricken as moot.  The Clerk is instructed to enter a Rule 58 judgment in favor of Defendants and against Plaintiff.  Civil case terminated.

Date:   September 3, 2024                  ENTERED:

IAIN D. JOHNSTON
United States District Judge

16